## BUISSON v. POTTS et al. *

### No. 4640.

Court of Appeal of Louisiana. Second Circuit.

Dec. 1, 1933.

Wise, Randolph, Rendall & Freyer, of Shreveport, for plaintiff.

Harry V. Booth and G. Randell Whitmeyer, both of Shreveport, for defendants.

TALIAFERRO, Judge.

Plaintiff was injured by a collision with the Chevrolet roadster of defendant Long-Bell Lumber Sales Corporation operated by Frank Potts, Jr., a minor, in the intersection of Margaret place and Southern avenue, in the city of Shreveport, at the hour of 6 p. m., December 30, 1931. At this intersection the avenue, which runs north and south, is 35 feet wide between curbs, and Margaret place is 23¾ feet wide from curb to curb. The avenue is served by two lines of street railway tracks. These tracks and the neutral ground between them cover 15 feet, leaving 10 feet clearance on the east and west sides of the street adjacent to the curbs. Plaintiff, at the time of the accident, was employed by a telephone company. The day's work being over, he tarried awhile at the grocery store at the southeast corner of Margaret place and Southern avenue and then walked across Margaret

*Rehearing denied February 5, 1934.

place (northerly) to the corner, where he was joined by an acquaintance, a witness in his behalf, and while awaiting the appearance of a south-bound street car, they talked of political matters. From this place and time to the injury to plaintiff we paraphrase the allegations of his original petition:

That he crossed from the east side of Southern avenue at the usual and customary place to board street cars en route to Cedar Grove, and had stationed himself at the usual and customary place used by pedestrians while awaiting the approach of south-bound cars, and that at this time a Cedar Grove street car was closely approaching, when suddenly an automobile, driven by a negro, came from behind said street car, on its right-hand side, and headed directly into him (plaintiff); that in order to avoid being run over by said automobile he walked back across the avenue, "towards the east side thereof at the usual and customary place used by pedestrians in negotiating said intersection"; that as he started to the said east side of the street an automobile owned by Long-Bell Lumber Sales Corporation, operated by the minor son of defendant, Frank Potts, was approaching said intersection from the south, a considerable distance therefrom; and that when plaintiff reached a point about midway of the neutral ground between the car tracks, the Potts car struck him violently with its left fender and dragged him up the avenue approximately 110 feet before coming to a stop.

Before the case went to trial, plaintiff filed a supplemental petition which in material respects altered and changed some of the allegations of fact of his original petition, narrated above. In the supplemental petition he states that he had *about* reached "the usual and customary place" used by pedestrians for the purpose of boarding out-bound street cars, approximately 21 feet from the east side of the avenue, and as the automobile driven by the negro came from behind the approaching street car, headed directly towards him, to avoid being run over by it, he "wheeled to his right and started back to the east side of the street," when he was struck by the car driven by young Potts; that when he originally started across the avenue to catch the approaching south-bound street car, the Potts car was nearly a block below him, coming north.

The specific acts of negligence charged to the operator of defendant's car are:

1. Neglect on his part to have kept a proper lookout for pedestrians crossing the intersection.

2. His failure to observe the condition of traffic on the avenue at that time, which, it is alleged, was heavy.

3. That he operated the car at the time at an unlawful rate of speed, in that he was going at the rate of 35 miles per hour, contrary to the laws of the city.

4. That the brakes on the car were deficient.

5. That he failed to grant to petitioner the right of way to cross the intersection ahead of his car.

6. That said driver had the last clear chance to have avoided striking and injuring petitioner, he being in a position of peril and without the opportunity of avoiding the accident.

7. That as the street was dry, the weather clear, said driver could have avoided the accident by applying the brakes, if they were efficient, and by veering his car to the right.

The parties made defendants originally were: Frank Potts, Long-Bell Lumber Company, Long-Bell Lumber Sales Corporation, and the Union Indemnity Company. While the suit was pending, the Union Indemnity Company was placed in the hands of receivers, who were afterwards made parties to the suit. Before the case was submitted to the jury, the suit against the Long-Bell Lumber Company was dismissed on motion of plaintiff's counsel.

Frank Potts was an employee of the Long-Bell Lumber Sales Corporation. The car that *struck plaintiff* belonged to it and was used generally by its employees in the discharge and performance of their duties to the company. Potts had driven the car from the company's office to his home, accompanied by Mr. E. J. Long, another employee of the Long-Bell Lumber Sales Corporation. It was from there that young Potts, at his father's request, drove the car. It is charged by plaintiff, and admitted by defendants, that in making this trip in the company's car Mr. Long was on an errand of business for the company. It is denied, however, that the company knew that young Potts was driving the car. Because of these facts Potts and the sales corporation were both made defendants.

The Union Indemnity Company had issued to the defendant corporation a policy of insurance on its Chevrolet car, protecting the owner against loss arising from collisions or accidents in which it was involved, hence its being made defendant.

The receivers of the Union Indemnity Company filed a plea to the jurisdiction of the court, ratione personæ and ratione materiæ, which was overruled. It is not urged in this court.

All defendants answered the original petition. They deny the allegations of fact relied on by plaintiff to recover for his injuries. They aver that if plaintiff was injured, as by him alleged, it was the result of his own carelessness, negligence, and want of care; that without taking due precaution for his own

safety on a busy street, and without looking where he was going, he ran into the side of defendant's automobile and struck it on the rear end of its left side. Negligence of any sort on part of defendants is specially denied; but if it should be found and held that they were negligent to any degree in connection with the accident, then they plead plaintiff's contributory negligence in bar of his right to recover, averring that his negligence was the proximate cause of the injuries received by him from the accident.

All defendants, except the Union Indemnity Company, answered plaintiff's supplemental petition. This answer is a general denial also, and is of same purport as their original answer, with the additional averment that plaintiff "suddenly and without warning ran into the side of the automobile" of Long-Bell Lumber Sales Corporation, driven by the son of defendant Potts.

The case was tried by jury, and, by a vote of 9 to 3, a verdict of $2,500 was rendered against Frank Potts and Long-Bell Lumber Sales Corporation. It was silent as to the Union Indemnity Company. From a judgment of the lower court, based upon the jury's verdict, the condemned defendants appealed. Plaintiff also appealed from the judgment impliedly in favor of Union Indemnity Company. He has answered defendants' appeal by praying for increase in the jury's award in his favor.

■ The imagination would have to be stretched to the breaking point to contemplate a case that could involve more conflicts of a material nature in the testimonial proof than are present in this case. We shall not undertake to reconcile these numerous patent contradictions in the evidence. It cannot be done.

Traffic on Southern avenue has the right of way over traffic entering that street from the east and west. Margaret place ends at the avenue. There is no street there going west. The speed limit on the avenue, in fact on all right of way streets of the city, is 23 miles per hour. It is charged by plaintiff that this rate was being exceeded by defendant's car when it struck plaintiff. We are convinced that this charge has been clearly proven. If the car had not been going at a greater rate than the legal one, it could and would have been stopped at a much shorter distance, after the accident, than it was stopped. Several of the witnesses say it traveled 110 feet before stopping. It is certain it did not stop under 79 feet; but if going 20 miles per hour, as Potts says, the car should have been stopped in 24 feet.

The street car plaintiff wanted to board entered Southern avenue on a left curve from the north, a short block above the spot he was proceeding to to board it. He had not reached the west curb of the avenue when an automobile with bright lights, driven by a negro man, suddenly came from behind and passed the street car on its right-hand side and undertook to straighten out in front of it, going south on the west street car track, or partly so. Plaintiff, confronted with the impending danger arising from this situation, sought to extricate himself from it by stepping backward, one or two steps, and in the same motion turning to his right, and it was at this juncture that there was contact between him and defendant's car. His head struck the support that upholds the top, which comes down to the side above the seat. He was carried many feet on the running board of the car. The testimony does not make it certain that he was on the running board when the car stopped. We are inclined to believe he fell off of it before it stopped. Young Potts, who was driving the car, and Mr. Long, riding with him, say plaintiff was on, or very close to, the east rail of the east car track when he was struck. This would have placed him not over 10 or 12 feet from the east curb. They are corroborated in their testimony on this point by the negro driver of the car that was in front of the street car. However, these occupants of defendant's car state that the negro's car was passing plaintiff (and very close to him) when their car struck him, or when he wheeled into the side of their car. The negro, on the contrary, is positive he never passed plaintiff at all, but brought his car to a stop against the west curb before reaching plaintiff. His testimony on this point is corroborated by one or two other witnesses, but we have to reject this testimony for two obvious reasons: (1) The clear preponderance of the testimony is contrary thereto; and (2) if this negro's car had stopped where he said it did, plaintiff would not have been threatened with danger from it, and would have had no reason for suddenly backing or stepping back to avoid being run over by it. And since it appears certain that plaintiff was in the direct line of travel of the negro's car, as it turned to its left in front of the street car, he must have been on the west car line about where he says he was before he made the effort to step back easterly to avoid being run over. None of the witnesses say plaintiff had gotten over a few feet back when hit, and young Potts and Mr. Long admit that the negro's car was passing very close to plaintiff when defendant's car side-swiped him. There is no practical reason proven, nor can one be deduced from the testimony, why plaintiff would have been as close to the east side of the street, when hit, as defendant's witnesses say he was. If plaintiff was in the middle of the street, or west of the middle, as he contends he was, when injured, then it follows beyond any question that defendant's car was not on its side of the street at the time, and that fact caused it to strike plaintiff, or caused him to back into it, when he moved from the path of travel of the negro's car. There are many strong circumstances, in addition to

positive testimony, in support of plaintiff's contention that defendant's car was near the center of the avenue when it injured him. This car, as it was coming north in the block below Margaret place, passed a north-bound street car, and a short distance above this point it also had to swerve to its left (west) to clear a truck parked against the east curb about 40 feet below the southeastern intersection of the avenue and Margaret place. This movement of the car put it out about the center of the street.

Mr. Long, in support of his evidence to the effect that Buisson was on or near the east car rail when hit, testified that the negro, after he passed around in front of the street car, continued to swerve his car to the left as though he intended entering Margaret place. It would have been necessary for the negro to have done this in order to pass so close to plaintiff to force him to step back, if he had been on or very near the east track, but a clear preponderance of the testimony is that the negro never swerved to his left after getting in front of the street car, but, on the contrary, continued down the avenue until he brought his car to a stop against the west curb.

Potts says when his car was halfway of the block he saw plaintiff as he started across the street to catch the street car, but never saw him any more before the accident. His line of vision was clear, unobstructed. He should have seen him; plaintiff was in the street all the time. Failure of young Potts to observe plaintiff's presence in the street ahead of him can only be accounted for by concluding that he was not keeping a careful lookout ahead, such as was required of him as he approached the intersection, or that he elected to forge ahead at an unlawful rate of speed without being able to see clearly ahead of his car the distance within which he could have stopped it if an emergency arose, and assumed that the way was open to him to do so. The situation there at the time was such as to impress him with the importance of exercising ultra precaution to insure his own and the public's safety. He knew a man had entered the intersection. He saw ahead of him the automobile and street car. He knew there was a street car to his rear. He did not know that there were no cars approaching from the east on Margaret place. With all these facts facing him he continued to drive the car ahead at a speed very much in excess of that authorized by law. As supporting the contention that defendant's car was traveling much faster than 20 miles per hour, it might be stated that while plaintiff, walking at the rate of 4 miles per hour, traveled 20 feet in 3.45 seconds, the car, moving at 20 miles per hour, would have covered 100 feet, and going at the rate of 35 miles per hour would have reached the upper side of the intersection in same lapse of time. If traveling at the rate young Potts and Long say they were going, this car could not have been in the intersection when the accident happened, but some 50 or 60 feet below.

It is obvious from this mathematical calculation that had defendant's car been keeping within the law, it would not have struck plaintiff, even if it were too far over towards the west side of the street. This excessive rate of speed, therefore, was a primary proximate cause of the accident, and the fact that the car was being driven too far towards the west side of the street was a secondary contributing factor to it. Capping both of these elements of negligence is the fact that the operator of defendant's car was not keeping a proper and careful lookout ahead, especially after seeing plaintiff enter the intersection. This was gross negligence on his part.

The principles involved in Matsler v. Jones Motor Co., 14 La. App. 175, 128 So. 721, 723, are on all fours with the present case, though the facts are to some extent different. In that case we said:

"There was no obstruction in the street and nothing to prevent the defendant driver from seeing plaintiff continuously from the time she entered the street, when he admits he did see her, until she had crossed the street, and the fact that he did not see her is because he was not looking and was not keeping a lookout for pedestrians at street crossings, which the law clearly makes his duty.

"It was clearly the duty of the defendant driver, upon seeing plaintiff enter the street, to have put his car under control, to have sounded his horn and to have kept a close lookout ahead. He did not sound his horn and, admittedly, did not keep a lookout ahead. His failure to do so was the proximate cause of the accident and was gross negligence on the part of the defendant driver."

In that case we quoted approvingly from Blashfield's Cyclopedia of Automobiles, vol. 1, p. 598, as follows:

"A person in charge of a vehicle approaching a street crossing is bound to the reasonable use of his senses to prevent injury to persons on foot using the crossing, and is bound to exercise such reasonable caution as an ordinarily careful and prudent person would exercise in like circumstances; such ordinary care and prudence requiring the driver to exercise the greatest caution, or, as it is expressed in some jurisdictions, requiring him to be highly vigilant and maintain control so that he can, on the shortest possible notice, stop his vehicle if necessary to prevent danger to pedestrians, or so as to obviate, as far as reasonably possible, a collision with pedestrians."

"Greater care is required from a motorist to avoid accident on a street crossing or in the crowded streets of the city than in streets of the open or suburban parts. * * * * "

"In the performance of such duty, besides having his car under reasonable control the driver of an automobile must keep a lookout ahead, operate his machine at a reasonable speed, having regard to the traffic, and give reasonable and timely warning of his approach by the usual and customary signal."

This doctrine is approved in the opinions in Johnson v. Boyle, 5 La. App. 362; and in Da Ponte v. Uzzo, 5 La. App. 105.

■ When plaintiff started across the intersection, he saw no cars on his left, except those a block or nearly so away. He had the right to then undertake the crossing, and to assume that he would be observed by operators of motor vehicles reaching the intersection before he had completely negotiated it, and that the law would be observed both as to rate of speed and line of travel of cars coming from his left, and being on the west side of the street, he assumed, and had the right to assume, that he was secure from being run into by vehicles approaching from the south. In Langenstein v. Reynaud, 13 La. App. 272, 127 So. 764, the syllabus, especially pertinent to this phase of the cases, reads:

"Pedestrian crossing street intersection has right to assume motorist, approaching 150 feet away at speed of 25 or 30 miles per hour, will keep proper lookout and use due precaution." Fontaine v. Dorsey, 15 La. App. 282, 131 So. 506; Hamilton v. Lee (La. App.) 144 So. 249; Schatz v. Kehoe, 15 La. App. 9, 131 So. 66.

■ It is urged that even though young Potts was negligent in operating defendant's car in the respects above mentioned, plaintiff himself was guilty of contributory negligence of such grave character as to forbid recovery by him. If plaintiff was guilty of negligence at all, it consisted of his turning round and colliding with, or backing into, the car behind him, without first looking to see if he could make these movements without injury to himself. We have touched heretofore on the right of plaintiff to assume that he was safe from danger from north-bound traffic after he had crossed the center of the street. When confronted with an emergency, having to think and act without deliberate reflection, and knowing he was where he had a right to be at the time, he could not be convicted of negligence because, before he sought to place himself in a position of safety, he did not scan the situation to advise himself if others were not observing the law and the elemental rules for the safety of pedestrians. To bar recovery, the negligence of the plaintiff must be the cause of the accident. Every sort of negligence by an injured person cannot be properly denominated contributory, in the eyes of the law. Gauvereau v. Checker Cab Co., 14 La. App. 448, 131 So. 590; Corpus Juris, vol. 45, § 511, p. 953. Plaintiff was not contributorily negligent.

■■ Long-Bell Lumber Sales Corporation denies any liability to plaintiff, even though his injury was caused by the negligence of young Potts while operating its car, for the reason that young Potts was not their agent or employee, and was not operating the car with their knowledge or consent, express or implied. We think this defense tenable. Young Potts was a student in high school. He rarely visited defendant's office and had driven the car only two or three times, and then at the instance of his father. The father usually drove the car himself, after the day's work was over, to his own home and then to the post office to post company mail, and then back to the home for the night. When plaintiff was injured, the son was driving the car with the consent and in the place of his father, and not to the knowledge of the company, its directors or officials.

The agent has not the right of substitution unless specially authorized by his principal. If the agent engages a substitute to act for him without the consent of the principal, the agent alone is responsible for the substitute's negligent or unlawful acts. Civ. Code, art. 3007.

It would be a highly dangerous doctrine that would render the employer responsible to third persons for the negligence or faults of one engaged by the employee to perform duties the employer had, for good reason to himself, intrusted to the fidelity of the employee to discharge. Such a doctrine would expose the principal or employer to loss, and ofttimes financial ruin, because of the ultra vires acts of the agent or employee. The employer is only responsible for the acts of the employee done within the scope of the duties of the employment. Surely, it cannot be said, with support of sound reason and logic, that because a business company is willing to intrust to a proven faithful employee the operation of its motor vehicle in the furtherance of its business, it would sanction or approve the act of such employee in substituting his own 16 year old son to drive the car at night on the crowded streets of a populous city. Under such circumstances, the driver of the automobile, though a son of, and authorized by, the employee, was a mere stranger to the owner of the car. Mere ownership of an automobile does not render the owner responsible for damages resulting from the negligent acts of another while operating it. The operator must be an agent or employee of the owner, acting within the scope of his employment or agency, to render the owner responsible for such damages. Bardt v. Champon, 6 La. App. 763.

Plaintiff's counsel earnestly contends that under the facts of the case young Potts was

in reality acting in the capacity of agent of the defendant company. We do not think so.

The syllabus in Rusha v. W. G. Coyle Co. et al., 149 La. 731, 90 So. 144, lays down the correct rule:

"An owner of an automobile is not liable for damages resulting from the negligence of some one else in the operation of the car, without proof or reasonable presumption that the person who operated the car was, employed or authorized by the owner to operate the car."

The case of Lanauze v. Baldwin & Co., 2 La. App. 345, is directly in point. The defendant's car was being driven by one Edwards, a competent operator, with the permission of defendant's agent, Buddendorf, who was also in the car, when plaintiff was run into on Canal street in the city of New Orleans and injured. The agent was then engaged in the discharge of duties in the scope of his employment. The question is discussed elaborately by the court. The employer was held not responsible. The syllabus, which accurately reflects the court's opinion, is as follows:

"A servant has no implied power to employ a substitute to do his master's work, and when a substitute employed by a servant without authority is guilty of negligence, the master is not responsible.

"Where a city drummer, whose business requires him to drive an automobile belonging to his employer, permits another person to drive his car and an accident happens while the car is being so driven, the employer and owner of the car is not responsible, it appearing that the City drummer had no authority to employ or permit a substitute to drive the car and there existed no custom to that effect and no emergency."

### Quantum of Damages.

■ Plaintiff had been employed by the Southern Bell Telephone Company for ten years as a cable splicer. To satisfactorily perform the duties of such employment, one has to be in good sound physical condition, with sight and hearing faculties functioning normally. He was discharged by the telephone company in July, 1932, at which time he was presented with a good service button, a testimonial to the satisfactory service he had rendered his employer over so long a period. It is alleged that plaintiff was discharged because the injuries received by him in the accident rendered him unfit to perform the duties of his employment. This is not affirmatively proved, but the inference may safely be drawn from the testimony on the point that at least his physical condition had some influence on his discharge. The company was "letting out" many of its employees, due to economic conditions. The physical condition of those of same grade and experience was the determining factor when an election was made.

The evidence as a whole convinces us that after plaintiff returned to his work, following the accident, he could not render the same efficient service he was able to render before he was injured. Whether this partial disability will prove permanent is uncertain. He had not entirely recovered from the effects of his experience a year after it happened. He received a terrific blow when his head struck the car and was rendered semiconscious. He was immediately carried to a sanitarium, where he remained for three days, and thereafter was confined to bed at home for thirty days. He had a cut across the forehead, the right ear was nearly severed, a large knot was raised on the left side of the neck, and the Adam's apple was injured. The injuries to the head and ear healed, but the knot on the neck had not entirely disappeared when the case was tried in the lower court. The Adam's apple will probably return to its normal condition. The impact with the car also disturbed the anatomy about the second and third vertebræ, producing a stiffness of the neck which affects his ability to turn the head without also turning the body to some extent. He suffered intense pain for many days following the injury, and says that the pain, uneasy feeling, and stiffness in the region of the upper spine and neck existed when the case was tried in April, 1933. His eyes were also affected, as well as his hearing. Prior to the accident, he was in splendid physical condition and earned $135 per month. To the date of trial, he had not succeeded in securing satisfactory employment.

The physicians who testified in the case differed widely as to plaintiff's condition and the extent of his injuries. His own family physician supports his testimony thereon.

Brushing aside the theories and opinions of the doctors and radiologists, we know that when one is struck by a rapidly moving automobile, though not head-on, there must result therefrom physical injuries of a serious nature. Plaintiff is in a better position to tell us of his pains, dizziness, uneasy feeling, etc., than any one else.

The verdict of the jury is not manifestly excessive and will be sustained.

It is not urged, nor could it well be urged, that defendant Potts is not responsible for the negligence of his minor son.

For the reasons herein assigned, the verdict of the jury and the judgment of the lower court against the Long-Bell Lumber Sales Corporation is annulled, avoided, and reversed, and plaintiff's suit as against it is dismissed, at his cost; in all other respects, the judgment appealed from is affirmed.